UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SEACOR PIEZO CERAMICS, LLC | : | |
| | : | |
| Plaintiff | : | |
| | : | Case No.: 3:01CV00754 (AWT) |
| v. | : | |
| | : | |
| APC INTERNATIONAL, LTD., | : | |
| AMERICAN PIEZO CERAMICS, INC., | : | |
| And FERROPERM PIEZOCERAMICS, | : | |
| A/S | : | |
| | : | |
| Defendants. | : | MARCH 29, 2007 |

---

## JOINT TRIAL MEMORANDUM

---

Pursuant to the Court's Trial Memorandum Order dated October 5, 2006,

as amended by the Court's scheduling order dated November 21, 2006, the

Plaintiff and Defendants in the above captioned case respectfully submit the

following joint trial memorandum:

I.    **TRIAL COUNSEL**

**Plaintiff**

Marie A. Casper
Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd.
P.O. Box 1740
Bridgeport, CT  06601-1740
Tel.:  203-333-9441
Fax:  203-333-1489
Email: mcasper@znclaw.com

**Defendants**

Donald W. O'Brien, Jr., Esq.
Woods Oviatt Gilman LLP
700 Crossroads Building
2 State Street
Rochester, NY  14614
Tel.:  585-987-2800
Fax:  585-987-2910
E-mail: dobrien@woodsoviatt.com

{776505:}

Frederick M. O'Brien, Esq.
Regnier, Taylor, Curran & Eddy
185 Asylum Street
CityPlace
Hartford, CT  06103
Tel.:  860-249-9121
Fax:  860-527-4343
Email:  fobrien@rtcelaw.com

## II.    JURISDICTION

### A.    Subject Matter Jurisdiction

Jurisdiction of this action is conferred by 28 U.S.C. §§ 1332 because the

parties are of diverse citizenship and the value of the amount in controversy

exceeds $75,000.00.

### B.    Personal Jurisdiction

The defendants do not challenge the court's exercise of personal

jurisdiction.

## III.    JURY - NONJURY

This case will be tried to the Court.

## IV.    NATURE OF CASE

### A.    Claims of Plaintiffs

(a)    Repudiation and breach by defendants of an "Agreement Between
Seacor Piezo Ceramics and Industrieselskbet Ferroperm A/S
Piezoceramics Division" (the "Distributorship Agreement") (the First
and Second Counts);

(b)    Tortious interference with business relations by defendants APC
International, Ltd. ("APCI") and American Piezo Ceramics, Inc.
("APC") (Fourth Count);

(c)    Violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§42-110a through 42-110q (CUTPA) by all defendants (Fifth Count);

[The claims for injunctive and other equitable relief asserted in Plaintiff's First Amended Complaint are presently moot.]

Plaintiff seeks the following relief:

(a)    Compensatory damages for breach of contract, tortious interference with business expectancies and violation of CUTPA;

(b)    punitive damages for tortious interference with business expectancies and violation of CUTPA;

(c)    attorneys fees under 42-110g(d).

## B.    **Defenses and Counterclaims**

1.    <u>Defenses</u>.  In their answer and throughout the course of this litigation, the defendants have denied that they repudiated or breached the "agreement between Seacor Piezo Ceramics and Industrieselskbet Ferroperm A/S Piezoceramics Division" (the "Agreement"); rather, the defendants maintain that they undertook to terminate the arrangement between Seacor Piezo Ceramics, LLC ("Seacor") and Ferroperm Piezoceramics A/S ("Ferroperm") in accordance with its terms.  In the April 20, 2001 termination letter which was sent by defendant APC International, Ltd. ("APCI") to Seacor, Seacor's principal, Eve Volk, was advised that

Seacor would be paid a commission of 12.5% during the three year run-out period provided for in the contract.

The defendants also allege that, even if the defendants' actions in formally terminating Seacor and announcing their intention to deal directly with the parties' customers constituted a breach of the Agreement, Seacor breached the Agreement long before April 20, 2001.  In particular, the defendants maintain that Seacor failed to inform all customers about the alternative possibility of purchasing components from Ferroperm directly, failed to respond to inquiries from existing and/or prospective customers on a timely basis, failed to pay Ferroperm on a timely basis for components which were ordered and shipped (and even lied to Ferroperm about the reason for this failure), failed to make available to customers the full range of Ferroperm products, set prices which were excessive and non-competitive from the customer's perspective and otherwise failed to deal with Ferroperm in a fair and reasonable manner.

While some of the defendants' equitable defenses may be

moot because the plaintiff's request for preliminary and

permanent injunctive relief has, in essence, been granted,

the defendants' defense of unclean hands is still operative.

Additional affirmative defenses have been asserted that the

plaintiff breached its duty of good faith in fair dealing,

breached its duty of loyalty, breached its fiduciary duty as an

agent, breached its duty to disclose material facts and that

Seacor's claims are otherwise contrary to equitable

principles.

Defendants APCI and American Piezo Ceramics, Inc.

("APC") (collectively referred to as "the APC defendants")

also deny that they tortiously interfered with Seacor's

business relations.  The APC defendants maintain that the

Agreement was both an agency and distributorship

agreement and that both the spirit and the letter of the

Agreement make clear that the customers were customers

of both Seacor and Ferroperm.

Finally, the defendants deny that they violated the

Connecticut Unfair Trade Practices Act ("CUTPA").  The

parties are all commercially sophisticated entities, conducting their affairs in accordance with an Agreement which was negotiated, presumably, at an arms length fashion. The decision to terminate Seacor and assert Ferroperm's right to deal directly with the customers was based upon a good faith interpretation of the Agreement, following consultation with counsel. As the termination letter itself indicates, the defendants attempted to terminate the Agreement in accordance with its terms and provide Seacor with a generous 12.5% commission for the three year run-out period specified in the Agreement.

Any direct communications between the defendants and the customers were consistent with the defendants' good faith interpretation of the Agreement. Even under Seacor's interpretation, it was not entitled to deal exclusively with the customers until it was terminated and, therefore, any communications and/or meetings between representatives of the defendants and representatives of the customers prior to April 20, 2001 did not violate the Agreement.

The defendants also maintain that, even if it is determined
that the defendants' interpretation of the Agreement was
incorrect, their actions in April of 2001 represented, at worst,
a mere breach of contract, without any of the aggravating
factors necessary to support a CUTPA claim.

2.    Counterclaims.  The defendants have asserted two
counterclaims, one based upon Seacor's breach of its
Agreement and, the second, based upon Seacor's breach of
its duty of good faith in fair dealing.  At this stage, Seacor still
owes Ferroperm in excess of Twenty-eight Thousand Dollars
($28,000.00) for goods which were shipped but not paid for.

## V.    STIPULATIONS OF FACT AND LAW

The parties proposed Joint Stipulation of Facts is attached hereto at Tab

A.

## VI.    PLAINTIFFS' CONTENTIONS

Prior to 2001, Plaintiff and Ferroperm had enjoyed a profitable and
harmonious commercial relationship whereby Plaintiff marketed and sold to
American companies piezo ceramics manufactured by Ferroperm in its Danish
factory. This relationship was memorialized in the Distributorship Agreement,
which designated Plaintiff as the U.S. distributor of Ferroperm's products,
required six months notice of termination, and further provided that in the event

of a termination by Ferroperm, Plaintiff would have exclusive rights to sell Ferroperm products for a period of three years after notification of termination to the customers served by Plaintiff

In or about 1999 to 2000, Plaintiff's principal, Eve Volk, attempted to purchase Ferroperm from its Danish owner.  When Ferroperm's managing director, Wanda Wolny, learned that this potential acquisition could negatively affect her management position with Ferroperm, she secretly solicited another U.S. company, defendant American Piezo Ceramics, Inc. ("APC"), to bid for the purchase of Ferroperm, and provided APC and its parent, defendant APC International, Ltd. ("APCI"), with confidential financial information about Plaintiff's bid to purchase Ferroperm.  Several months after Ferroperm rejected Plaintiff's purchase bid, APCI and Ferroperm entered into a letter of intent regarding APCI's purchase of Ferroperm, which closed on or about March 29, 2001.

In connection with its distributorship relationship with Ferroperm, Plaintiff had provided Ferroperm with detailed information about its U.S. customers, as necessary to order the correct types, specifications and numbers of parts, most of which were customized for each customer.  Plaintiff also included the managing director Ferroperm in many of its marketing activities, such that she gained first hand knowledge of many details of Plaintiff's customer contacts. Commercial information about Plaintiff's customers, including details about the persons responsible for making decisions about the purchase of piezo ceramics and the manner in which such decisions were made for each customer, was

proprietary to Plaintiff. Plaintiff had disclosed its proprietary commercial information to Ferroperm in the reasonable expectation the information would not be used to solicit Plaintiff's customers.

In early 2001, Plaintiff had heard rumors of an impending purchase of Ferroperm. It contacted Ferroperm's owner to ask about the status of Ferroperm but received no response. Ferroperm's managing director indicated only that Seacor's rights would be preserved in connection with any acquisition. On or about April 20, 2001, soon after Ferroperm was acquired by APCI, APCI's CEO sent Plaintiff a letter terminating the Distributorship Agreement and warned Plaintiff not to interfere with Ferroperm's U.S. customers (which were Plaintiff's customers).

Before sending notice of termination, Defendants knew that, absent a prior breach, the Agreement was enforceable and six months' notice of termination was required. Defendants did not terminate the Agreement on the basis of any prior breach by Plaintiff, and the Agreement had not been materially breached by Plaintiff prior to the notice of termination. Yet Defendants failed to provide any notice of termination whatsoever, and contacted some of Plaintiff's customers to discuss dealing directly with those customers before Plaintiff was even notified of the termination.

Defendants' threat to withhold commissions if Plaintiff attempted to deal with Plaintiff's own customers, which was contained in the termination notice, contradicted a provision in the Distributorship Agreement stating that "if

Ferroperm takes the action of termination, Seacor Piezo Ceramics will continue exclusive sales to companies that have been served by Seacor Piezo Ceramics for *three years* after the notification of termination." (Emphasis supplied).

On or about the very same date Defendants terminated the Distribution Agreement, they also suddenly refused to fill and ship Plaintiff's open orders, with no prior notice. Defendants unilaterally notified Plaintiff's customers that Ferroperm would not be shipping to Plaintiff. Defendants covertly asked for and obtained copies of Plaintiff's open orders, showing Plaintiff's confidential pricing information, with at least two of Plaintiff's largest customers even before sending the notice of termination or otherwise notifying Plaintiff. Defendants also instructed Plaintiff's customers they could deal directly with Ferroperm or APC. One day after the date on the notice of termination, Defendants began attempting to fill Plaintiff's open orders using Plaintiff's proprietary information about Plaintiff's open order that they had covertly obtained from Plaintiff's customers by misrepresenting the status of Plaintiff's rights under the Distributorship Agreement.

Defendants were motivated to terminate Plaintiff as a Ferroperm distributor immediately after the closing of APCI's acquisition of Ferroperm by their plan to divert Plaintiff's business to themselves, as well as by personal animus of Ferroperm's managing director towards Plaintiff's principal. Defendants' efforts to fill Plaintiff's orders at the same time Plaintiff continued to fill the orders resulted in substantial customer confusion. Defendants'

communications to Plaintiff's customers about the status of their orders with Plaintiff further confused the customers and disrupted Plaintiff's relationships and goodwill with its customers.

The disruption had a particularly detrimental effect on Plaintiff's business because the customers rely upon the piezoceramic parts as strategically important components of their products, and thus were deeply concerned about events that appeared to disrupt and threaten their source for the parts. Up until the events surrounding Plaintiff's termination as a distributor, Ferroperm/Seacor piezoceramic parts had been the sole source of supply for Plaintiff's important customers. The conclusion and disruption caused by Defendants' wrongful and ill-advised approaches to Plaintiff's customers permanently harmed Plaintiff's goodwill and business relationships by causing the customers to question the stability of their sole source of supply for strategic components.

Defendants' interference with Plaintiff's customers harmed Plaintiff in the form of lost sales to PCB, the complete loss of two customers, Blatek (loss of all but one low-volume part) and Piezo Kinetics, shorter blanket order duration as to three customers (PCB, CTC and Accusonics) and overall lost business, as evidenced by the severe diminution in Plaintiff's revenues commencing almost immediately after Defendants' interference and extending throughout the run-out period under the Distributorship Agreement, as compared to Plaintiffs' average revenues for the prior five years.

In addition to the harm caused by Defendants' interference with Plaintiff's

customers prior to the entry of preliminary injunctive relief, Defendants' continued to wrongfully solicit and interfere with Plaintiff's customer relationships after the entry of temporary and preliminary injunctive relief, using Plaintiff's confidential information.1  For example, Ferroperm sold parts to PCB that were identical to the parts Plaintiff had exclusive rights to sell during the period of the Preliminary Injunction by deploying a scheme to disguise the sales.  Instead of selling the parts directly to PCB, Ferroperm sold them to a German PCB distributor, which then passed the parts on to PCB. Ferroperm shipped two of the orders placed by the German affiliate to the home of PCB's supply manager, Erwin Rakoczy, who promptly delivered the parts to PCB.  This continuing interference further undermined Plaintiff's sales, customer relationships and ability to transition business to other sources of supply.

Plaintiff's contentions are as follows;

a.    Defendants breached the Distributorship Agreement provision requiring six months notice of termination by advising Plaintiff's customers that Plaintiff no longer was a Ferroperm distributor and refusing to fill Plaintiff's orders at around the same time it first sent notice of termination to Plaintiff.

b.    Defendants breached the Distributorship Agreement provision entitling Plaintiff to exclusive sales for three years to the customers served by Plaintiff by directly soliciting Plaintiff's customers and refusing or delaying

---

1 In or about April of 2002, defendants APCI sold its interest in Ferroperm to a group of persons consisting of Ferroperm management and a new investor.  Thereafter, as far as is known by Plaintiff, APC and APCI were not involved in transactions or communications with Plaintiff's customers.

Plaintiff's orders, both before and after preliminary injunctive relief entered in favor of Plaintiff in this action.

     c.    Defendants intentionally and wrongfully interfered with Plaintiff's relations with its customers by (1) secretly visiting two of its largest customers, soliciting direct orders and discussing pricing before Defendants ever notified Plaintiff of their decision to terminate the Distributorship Agreement, and (2) using confidential business information provided by Plaintiff to Ferroperm to solicit Plaintiff's customers, both before and after preliminary injunctive relief was ordered in favor of Plaintiff in this action.

     d.    Plaintiff sustained damages from Defendants' breaches of the Distributorship Agreement, as follows:

     1.    Defendants' sudden termination of the Distributorship Agreement without giving Plaintiff the required six months notice of termination deprived Plaintiff of the opportunity to communicate with its customers about the future of Plaintiff's relationship with Ferroperm and/or an eventual transition to other sources of supply before the termination took effect. The sudden termination caused panic and instability in Plaintiff's relations with its customers and was a substantial cause in the decisions of certain customers to find alternate sources of supply through distributors other than Plaintiff.

     2.    Defendant's refusal to sell parts to Plaintiff immediately after it sent notice of termination, in breach of their contractual obligations,

confused and dismayed Plaintiff's customers, causing further concern about Plaintiff's reliability as a source of supply of piezo ceramics.

     3.     Plaintiff lost all business from important customers, and lost part of its historical business from other customers, as a result of Defendants' breaches of the Distributorship Agreement.

     4.     Defendants' unilateral, secret pre-termination meetings with two of Plaintiff's largest customers, during which Defendants instructed the customers that they should obtain piezo ceramics directly from Ferroperm or APC, caused confusion and concern on the part of the customers, which then began exploring alternate sources of supply for the strategically important piezo ceramics purchased up until that time through Plaintiff. The customers' confusion and concern (which filtered throughout the small piezo ceramics industry) caused a reduction in business from these and other customers, and ultimately, the loss of many of Plaintiff's customers, even after Plaintiff was reinstated as a distributor to these customers through injunctive relief. Defendants kept their pre-termination meetings secret from Plaintiff so that they could steal Plaintiff's business before Plaintiff had a chance to respond.

     5.     Even after injunctive relief entered in this action allowing Plaintiff to obtain and sell Ferroperm parts to its customers for the three-year agreement run-out period, Defendants continued to use Plaintiff's confidential business information to solicit and interfere with Plaintiff's

relations with its customers and obtain orders in violation of the preliminary injunction.

6.    As a result of Defendants' intentional and wrongful interference, Plaintiff lost all business from important customers, and lost part of its historical business from other customers.

7.    Plaintiff is entitled to punitive damages as a result of Defendants' intentional and wrongful interference with Plaintiff's business relations with its customers, in the amount of the attorneys' fees Plaintiff has incurred to pursue this action.

8.    Defendants engaged in the following deceptive and unfair business practices in violation of CUTPA:

a.    By deceptively orchestrating the termination of Plaintiff's Distributorship Agreement such that Plaintiff was not notified of either the acquisition of Ferroperm by APCI or the termination of Plaintiff's agreement until after Defendants had already contacted and solicited Plaintiff's key customers;

b.    By refusing to supply Plaintiff with Ferroperm parts at the same time Defendants were obtaining and attempting to fill Plaintiff's open orders by notifying Plaintiff's customers that they should deal with Ferroperm or APC, not Plaintiff;

c.    By using confidential information provided by Plaintiff to Ferroperm for the improper purpose of bidding against Plaintiff

for the purchase of Ferroperm and then attempting to appropriate for Defendants Plaintiff's U. S. customers.

        d.     By plotting with PCB to sell parts for which Plaintiff had exclusive sales rights during the Preliminary Injunction period, attempting to disguise the sales by using as a "cut-out" a PCB German affiliate, and also shipping the parts to the home address of PCB's supply manager.

9.     Plaintiff is entitled to compensation damages, punitive damages and attorneys' fees as a remedy for Defendants' deceptive and unfair trade practices.

## VII.    DEFENDANTS' CONTENTIONS

Contrary to Seacor's assertions, as of April of 2001, the relationship between Seacor and Ferroperm was no longer harmonious. Seacor was chronically late in its payments to Ferroperm for piezo ceramics shipped to Seacor and Ferroperm received numerous complaints that Seacor had failed to respond to inquiries from existing and prospective customers. And, while the relationship was profitable, it was more profitable for Seacor whose markup to the customers ran as high as 60%.

Although the Agreement between Seacor and Ferroperm required that Seacor inform all customers that they had the right to purchase their piezo ceramics directly from Ferroperm, in practice, Seacor's principal, Eve Volk, took great pains to protect Seacor's profit margin and deprive customers of any

realistic opportunity to buy directly from Ferroperm. Even though the customers were customers of both Seacor and Ferroperm, Ms. Volk demanded that Ferroperm representatives limit their contacts to the customers to technical issues only. Even periodic visits by Ferroperm's representative, Wanda Wolny, to the United States were closely monitored by Ms. Volk, who scripted the meetings to ensure that the customers and Ms. Wolny never discussed pricing or any other business terms. In this way, Seacor could prevent the customers from discovering the extent to which Seacor marked up the prices on the piezo ceramics sold by Ferroperm to Seacor.

The defendants maintain that Seacor's failed attempt to purchase Ferroperm is irrelevant to this action and any dissatisfaction Seacor experienced as a result of this unsuccessful effort should be aimed at Ferroperm's former owner, Jens Peter Holm. Mr. Holm owned all but a small percentage of Ferroperm's stock and he decided to whom Ferroperm would be sold. Any information regarding the technical requirements of Ferroperm's customers was already known to Ferroperm's representatives, including Ms. Wolny, so whatever information may have been imparted by Seacor to Ferroperm at the time it was negotiating a possible purchase of Ferroperm was immaterial.

There was nothing sinister about APCI's acquisition of Ferroperm. Ferroperm was widely recognized as a manufacturer of high-quality piezo ceramics and was a good strategic fit for APCI and its customers. Following the closing on March 29, 2001, APCI representatives, including Ian Henderson and

Ron Staut, began consultations with Ferroperm representatives regarding a wide variety of business issues, including an evaluation of the individuals and entities serving Ferroperm as agents or distributors.  Seacor's record was spotty and APCI management was troubled by the fact that its performance in recent months had deteriorated.  APCI management learned of Seacor's payment problems and customer complaints and was also concerned that Seacor had not significantly expanded the customer base.  In the eyes of Mr. Henderson and Mr. Staut, good cause existed for terminating Seacor as an agent/distributor based upon these negatives.

Nevertheless, APCI management was reluctant to take a hard line with Seacor and, instead, chose to terminate Seacor in accordance with the terms of the Agreement.  APCI management sought the guidance of counsel interpreting what is, at best, an ambiguous Agreement before taking any action regarding Seacor.  With the advice of counsel, APCI terminated Seacor by letter dated April 20, 2001.  According to its interpretation of the Agreement, APCI and Ferroperm agreed to pay Seacor a 12.5% commission on all piezo ceramic products sold to the existing customers for the three year run-out period specified in the Agreement.

Consistent with its good faith interpretation of the Agreement, the defendants believed they were entitled to deal directly with the customers and, to that end, took steps to facilitate a smooth transition.  Seacor makes much of two personal visits paid by Mr. Staut to PCB and Kistler shortly after APCI acquired

Ferroperm. Since these meetings took place prior to the termination, the defendants were within their rights to meet with customers as the exclusivity period asserted by Seacor had not yet taken effect. More important, during these visits, the customers were told that they could continue to purchase their Ferroperm piezo products through Seacor. As a follow up to one of these visits, the defendants did acquire Seacor's pricing but, again, there is nothing in the Agreement which prohibited the disclosure of this information and, had Ferroperm sought to obtain this information at any time prior to its acquisition by APCI, the Agreement would not have prohibited such an inquiry. Seacor's real complaint is that this disclosure by the customer revealed to the defendants how uncompetitive Seacor's pricing had become.

Even if Seacor's interpretation of the Agreement is correct and Seacor was entitled to exclusivity for the three year run-out period, the modest preliminary steps taken by the defendants did not constitute a violation of the Connecticut Unfair Trade Practices Act (CUTPA). The defendants proceeded upon the advice of counsel in reliance upon a good faith interpretation of the Agreement and any communications between the defendants and the customers was consistent with that interpretation. Viewed in that context, there is no evidence of any conspiracy or tortious interference. Moreover, there is no evidence to suggest that defendants engaged in any deceptive or fraudulent behavior or any other conduct beyond that of a mere breach of contract. Ms. Volk's position that the defendants were somehow required to keep her

informed on a day-to-day basis regarding the status of the acquisition and allow her to participate in the internal evaluations of Seacor's performance is unsupported by the Agreement and inconsistent with general commercial practices.

The termination letter sent to Seacor is dated April 20, 2001. By May 4, 2001, a temporary restraining order ("TRO") had been signed, entered and served upon the defendants. The TRO and, later, the preliminary injunction guaranteed Seacor the exclusivity it demanded. From that point forward through the balance of the run-out period, all communications of a commercial nature originated with Seacor, and Ferroperm was limited to communications of a technical nature only. Because the preliminary injunction extended through the entire three year run-out period, Seacor was, in effect, awarded the permanent injunctive relief sought in its complaint.

There is virtually no evidence that the temporary disagreement over the ability of the defendants to deal directly with the customers resulted in any damage to Seacor. On the contrary, no outstanding Seacor orders were displaced and the TRO ensured that Seacor, not the defendants, continued to deal directly with the customers. While Seacor complains of the "disruption" caused by the defendants' conduct and contends that this alleged disruption had a detrimental affect on Seacor's business, there is no evidence in the record to support this contention. In particular, Seacor continues to claim that it lost sales to PCB whereas the credible evidence establishes that, to the extent Seacor was

replaced as a supplier for PCB by other, lower-priced competitors, this change was unrelated to anything the defendants did in April of 2001. On the contrary, any changes in PCB's ordering practices with Seacor were attributable to a company-wide policy initiated to generate competition among prospective vendors in order to reduce costs. At the deposition of Camille Saia, Purchasing Agent for PCB, held on November 7, 2002, Ms. Saia testified that she was directed by her superiors to find new sources for piezo ceramics at more competitive prices. As a result, she identified eight part numbers and solicited bids from 12 to 14 different vendors. According to Ms. Saia, the same sort of process was undertaken with respect to other components used by PCB in its manufacturing process. As a result of this process, only one of eight parts which was submitted for competitive bidding was awarded to another vendor and, with respect to that part, the competitor's price was much lower. This is not surprising, given the hefty markups which Seacor insisted upon.

Similarly, there is no evidentiary support for Seacor's claim that it sustained "overall lost business." Seacor's proposed proof that there was a decline in its revenues as compared to its average revenues for the prior five years overlooks the fact that there was a downturn in demand for electronic components in general and piezo ceramics in particular in 2002 (*see,* the May 8, 2003 affidavit of Wanda Wolny with exhibits attached thereto).

With respect to Seacor's allegations that Ferroperm somehow initiated a scheme to avoid the restraints contained in the preliminary injunction, there is

similarly no proof in the record. On the contrary, the evidence, including the

testimony of Erwin Rakoczy, former Supply Manager for PCB, demonstrates that

his superiors at PCB, which was not bound by the terms of the preliminary

injunction, employed an intermediary in Germany to secure Ferroperm parts

without paying Seacor's prices for them. Ferroperm dealt with a German

company, SynoTECH, which supplied its own drawings and never identified its

own end user. When Ferroperm representatives finally learned that the German

customer was selling the piezo ceramics to PCB, less than a month remained on

the run-out period and, by then, Ferroperm already had existing inventory and

work in progress. No further orders were accepted from SynoTECH for this part.

The defendants' contentions are as follows:

(a)     The defendants did not breach the Agreement and terminated
        Seacor in accordance with its terms.

(b)     If the defendants did breach the Agreement, then their actions were
        based upon a good faith interpretation of an inartfully drafted
        Agreement. Any actions undertaken by the defendants were
        consistent with this good faith interpretation and minimal in scope.
        The defendants' conduct, at worst, amounted to a mere breach of
        contract.

(c)     Any breach of the Agreement by the defendants was preceded by a
        breach of the Agreement on the part of Seacor.

(d)     The defendants did not interfere with the plaintiff's relations with its
        customers in that, first, the two personal visits paid by
        representatives of the APC defendants to PCB and Kistler were
        entirely appropriate and, second, the defendants did not use
        confidential information to solicit the customers, who were
        customers of both Seacor and Ferroperm.

(e)     The aggravating factors necessary to support a CUTPA claim are

absent.

(f)    Seacor sustained no ascertainable loss as a result of any acts or omissions on the part of the defendants.

(g)    Seacor obtained complete relief consistent with the prayers for relief in its complaint in that the preliminary injunctive relief was transformed into a permanent injunction continuing through the balance of the run-out period.

(h)    There is no basis for the award of punitive damages or attorneys' fees.

(i)    Ferroperm is entitled to damages in an amount to be determined at trial but in the approximate amount of Twenty-eight Thousand Dollars ($28,000.00).

## VIII.  **LEGAL ISSUES**

### A.    **Plaintiff's legal Issues**

This case presents material factual and legal issues, including the

following:

(a)    Whether Defendants breached the Distributorship Agreement by failing to provide Plaintiff six month's notice of termination;

(b)    Whether Defendants breached the Distributorship Agreement by refusing to allow Plaintiff exclusive rights to continue to serve its customers after notice of termination;

(c)    Whether Defendants breached the Distributorship Agreement even after injunctive relief entered in this action by continuing to solicit and interfere with Plaintiff's customers;

(d)    Whether Defendants intentionally and wrongfully interfered with Plaintiff's business relations with its customers, both before and after the injunctive relief entered;

(e)    Whether Defendants engaged in unfair and deceptive business practices in violation of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a, et seq., in connection with wrongful business

dealings with Plaintiff and its interference with Plaintiff's business relations with its customers;

(f)    Whether, and to what extent, Plaintiff sustained damages as a result of Defendants' wrongful business dealings with Plaintiff and wrongful interference with Plaintiff's business relations with its customers.

(g)    Whether, and to what extent, Plaintiff is omitted to punitive damages and/or attorneys' fees.

**B.    Defendants' Legal Issues**

From the defendants' standpoint, this case presents the following legal issues:

(a)    Whether the defendants breached the Agreement;

(b)    Whether or not the plaintiff satisfied the conditions imposed upon it in the Agreement;

(c)    Whether or not the plaintiff breached the Agreement;

(d)    Whether or not there is any evidence to support a finding that the defendants engaged in unfair and deceptive business practices in violation of the Connecticut Unfair Trade Practices Act;

(e)    Whether or not there is any evidence to support the plaintiff's claim that the defendants tortiously interfered with Seacor's business relations;

(f)    Whether there is any evidence of an ascertainable loss by Seacor;

(g)    Whether or not the plaintiff is entitled to any compensatory or punitive damages; and

(h)    Whether or not the defendant, Ferroperm, is entitled to damages for unpaid invoices.

IX.    **VOIR DIRE QUESTIONS**

Not applicable.

X.    **LIST OF WITNESSES**

A.    **Plaintiff's Fact Witnesses**

1.    **Eve Volk**
      **Seacor Piezoceramics, LLC**

      Subjects of Anticipated Testimony: Ms. Volk is expected to
      testify about Plaintiff's effort to purchase Ferroperm; the pre-
      termination business relationship between Plaintiff and
      Ferroperm; Defendants' termination of Plaintiff as a
      distributor; business dealings between Plaintiff and
      Defendants during the period after injunctive relief entered in
      this action; damages sustained by Plaintiff as a result of
      Defendants' conduct.

2.    **Ronald Staut**
      **American Piezo Ceramics, Inc.**

      Subjects of Anticipated Testimony: Mr. Staut is expected to
      testify about APCI's acquisition of Ferroperm, his meetings
      with two of Plaintiff's customers prior to Plaintiff's
      termination, and other solicitations by Defendants of
      Plaintiff's customers.

3.    **Ian Henderson**
      **APC International, Inc.**

      Subjects of Anticipated Testimony: Mr. Henderson is
      expected to testify about APCI's acquisition of Ferroperm,
      his decision to terminate Plaintiff, and ongoing business
      activities of Ferroperm after its acquisition by APCI.

4.    **Wanda Wolny**
      **Ferroperm Piezoceramics A/S**

      Subjects of Anticipated Testimony: Wanda Wolny is
      expected to testify about the Distributorship Agreement, the
      long standing relationship between Plaintiff and Ferroperm,
      negotiations for and the eventual sale of Ferroperm, her

relationship with APC, dealings between Ferroperm and
Plaintiff in late 2000 and early 2001, Defendants' conduct
relating to Plaintiff and its customers in the Spring of 2001,
Plaintiff's termination and post-injunctive communications
and transactions between Ferroperm and Plaintiff's
customers.

**5.    Camille Saia**
       **PCB**

Camille Saia, a supply logistics employee of PCB, is
expected to testify about PCB's dealings with Seacor as a
piezoceramics distributor prior to the termination of Seacor's
contract, pre-termination contacts by defendants, the effect
of defendants' conduct on Seacor's business relationship
with PCB, and Ferroperm's covert solicitation of PCB in the
three year contract run-out period.

6.    Laboratory Employee

An as yet unascertained laboratory employee is expected to
testify that tests to be performed on parts ordered by Seacor
from Ferroperm for resale to Glide-Write were made from
PZ 21 material instead of PZ 27 material as specified on the
Ferroperm order confirmations and invoices.

**B.    Plaintiff's Objection to Defendants' Witnesses**

None.

**C.    Defendants' Fact Witnesses**

1.    **Wanda Wolny**
      **Ferroperm Piezoceramics A/S**

Subjects of Anticipated Testimony:  Ms. Wolny is expected
to testify about the parties' implementation of the Agreement,
the deficiencies in Seacor's performance before and at the
time of APC's acquisition of Ferroperm, the reasons for the
defendants' termination of Seacor as a distributor/agent, the
parties' performance under the terms of the preliminary
injunction, the defendants' response to the plaintiff's claims,
the piezoceramics business in general and the damages

sustained by Ferroperm as a result of Seacor's non-payment.

2.    **Ronald Staut**
      **American Piezo Ceramics, Inc.**

      Subjects of Anticipated Testimony: Mr. Staut is expected to testify about APCI's acquisition of Ferroperm, the reasons for the termination of Seacor as Ferroperm's distributor/agent, his activities immediately after the acquisition, the defendants' response to the plaintiff's claims and the piezoceramics business in general.

3.    **Ian Henderson**
      **APC International, Ltd.**

      Subjects of Anticipated Testimony: Mr. Henderson is expected to testify about APCI's acquisition of Ferroperm, the reasons for the termination of Seacor as Ferroperm's distributor/agent, the defendant's response to the plaintiff's claims and the piezoceramics business in general.

4.    **Eve Volk**
      **Seacor Piezo Ceramics, LLC**

      Subjects of Anticipated Testimony: Ms. Volk is anticipated to testify about her performance as a distributor/agent, her implementation of the Agreement, her deficiencies as a distributor/agent, including late payment and customer service issues, and the piezoceramics business in general.

5.    **Todd Cook**
      **Connection Technologies Center**

      Subjects of Anticipated Testimony: Mr. Cook is expected to testify regarding his reliance upon Ferroperm as a sole source supplier of piezoceramics for his company, conversations he had with Eve Volk and the comparative performance of Seacor and Ferroperm as suppliers of piezoceramics.

D.    **Defendants' Objections to Plaintiff's Witnesses**

None.

## XI.  EXHIBITS

### A.  Plaintiff's Proposed Trial Exhibits

Plaintiff's  schedule of proposed trial exhibits is attached hereto at Tab B.
Plaintiff reserves rights to add any documents received from Defendants in
response to Defendants' supplemental discovery obligations.

### B.  Defendant's Proposed Trial Exhibits

Defendants' schedule of proposed trial exhibits is attached hereto at Tab

C.

## XII.  DEPOSITION TESTIMONY

### A.  Plaintiff

Plaintiff's schedule of deposition and hearing testimony is attached hereto

at Tab D.   Plaintiff will offer the deposition testimony of the following individuals:

- Deposition of Michael Seitz   (April 24, 2002)

- Deposition of Erwin Rakoczy (February 13, 2007)

To the extent that Ronald Staut, Ian Henderson, Wanda Wolny or Camille

Saia are not available to testify at trial, Plaintiff will offer the following deposition

and hearing testimony:

- Deposition of Ronald Staut  (June 11, 2002)

- Deposition of Ian Henderson  (June 20, 2001)

- Deposition of Wanda Wolny  (July 24, 2002, July 26, 2001 and

March 8, 2007)

- Deposition of Camille Saia (November 7, 2002)

- Testimony of Ronald Staut at the Hearing on Plaintiff's Motion for Preliminary Injunction (the "Injunction Hearing") July 30-31, 2001;

- Testimony of Ian Henderson at the Injunctive Hearing, July 30-31, 2001;

- Testimony of Wanda Wolny at the Injunctive Hearing, July 31, 2001.

These depositions and hearing transcripts also will be used for impeachment purposes if necessary.

**B.    Defendants**

Defendants' schedule of deposition and hearing testimony excerpts is attached hereto at Tab E.  Defendants will offer the deposition testimony of the following individuals:

- Deposition of Eve Volk (June 1, 2001)

- Deposition of Eve Volk (July 20, 2001)

- Deposition of Wanda Wolny (July 31, 2001)

- Deposition of Michael Seitz (April 24, 2002)

- Deposition of Camille Saia (November 7, 2002)

- Deposition of Erwin Rakoczy (February 13, 2007)

- Preliminary Injunction Hearing Testimony of Eve Volk (July 30, 2001)

To the extent that Renae Kennedy and Mary Varrechia are not available to testify at trial, defendants will offer the following deposition testimony:

-    Deposition of Renae Kennedy (July 27, 2001)

-    Deposition of Mary Varrechia (July 20, 2001)

All depositions and hearing transcripts will be used for impeachment purposes if warranted.

XIII.   **REQUESTS FOR JURY INSTRUCTIONS**

    Not applicable.

XIV.   **ANTICIPATED EVIDENTIARY PROBLEMS**

    **A.**    **Plaintiff**

None.

    **B.**    **Defendants**

    See Defendants' Potential Evidentiary Issues, attached at Tab F.

XV.   **PROPOSED FINDINGS AND CONCLUSIONS.**

    **A.**    **Plaintiff**

    Plaintiff's Proposed Findings of Fact and Conclusions of Law are attached at Tab G.

    **B.**    **Defendants**

    Defendants' Proposed Findings of Fact and Conclusions of Law are attached at Tab H.

XVI.   **TRIAL TIME**

    The parties expect the trial to take three to five days.

XVII.   **FURTHER PROCEEDINGS**

    Plaintiff reserves the right to move to compel Defendants to produce

supplemental discovery responsive to Plaintiff's requests for production served on Defendants during the course of discovery.  Requests for the supplemental discovery have been made via letters from Plaintiff's counsel to Defendants' counsel dated February 2, 2007, February 8, 2007 and March 22, 2007, but Plaintiff has not yet received a response to these requests.

XVIII. **ELECTION FOR TRIAL BY MAGISTRATE**

The parties have not agreed to trial by a Magistrate Judge.

**Plaintiff Seacor Piezoceramics, LLC**

By: _____               Date:  March 29, 2007
     Marie A. Casper (ct08974)

      Zeldes, Needle & Cooper, P.C.
      1000 Lafayette Blvd.
      P.O. Box 1740
      Bridgeport, CT  06601-1740
      Tel.:  203-333-9441
      Fax:  203-333-1489
      Email: mcasper@znclaw.com

**Defendants APC International, Ltd.,
American Piezo Ceramics, Inc., and
Ferroperm Piezoceramics A/S**

By: _____ /s/         Date:  March 29, 2007
     Donald W. O'Brien, Jr. (ct22628)

      Woods Oviatt Gilman LLP
      700 Crossroads Building
      2 State Street
      Rochester, NY  14614
      Tel.:  585-987-2800
      Fax:  585-987-2910
      Email: dobrien@woodsoviatt.com

## CERTIFICATION OF SERVICE

I hereby certify that on **March 29, 2007**, a copy of foregoing **Joint Trial Memorandum** was filed electronically and served by mail to anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


PLAINTIFF SEACOR PIEZO
CERAMICS, LLC


By: _____
   Marie A. Casper (ct08974)

ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
P.O. Box 1740
Bridgeport, CT 06601-1740
Tel:  (203) 333-9441
Fax: (203) 333-1489
Email:  mcasper@znclaw.com

Its Attorneys