**EXHIBIT G**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SEACOR PIEZO CERAMICS, LLC   :
                             :
        Plaintiff            :
                             :   Case No.: 3:01CV00754(AWT)
v.                           :
                             :
APC INTERNATIONAL, LTD.,     :
AMERICAN PIEZO CERAMICS, INC.:
And FERROPERM PIEZOCERAMICS  :
A/S                          :
                             :
        Defendants           :   MARCH 29, 2007

## PLAINTIFF'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1.     Seacor Piezo Ceramics, LLC ("Seacor") was the sole United States distributor of Ferroperm Industriselskabet Ferroperm A/S ("Ferroperm") products under a "Agreement Between Seacor Piezo Ceramics and Industriselskabet Ferroperm A/S Piezoceramics Division" (the "Agreement"), dated January 30, 1992 and February 4, 1992. The Agreement was supplemented by the parties' course of dealing, which acknowledged that Ferroperm would supply Seacor the parts and technical information necessary to service Seacor's customers.

2.     Ferroperm manufactures piezo ceramics, which are ceramics that have precise electrical characteristics. The piezo ceramics manufactured by Ferroperm are utilized as key components in accelerometers, and U.S. companies

manufacturing accelerometers accounted for most of the U.S. sales of Ferroperm products.

3. Prior to Ferroperm's relationship with Seacor, it had no United States business.

4. Over the course of eight years, Seacor developed a substantial customer base for Ferroperm piezo ceramics, which were considered to be superior to piezo ceramics produced by other manufacturers and its purchase of Ferroperm products for resale to United States customers comprised about 33% of Ferroperm's total worldwide sales.

5. The piezo ceramics manufactured by Ferroperm typically are customized to each end user's specifications, require a lengthy development period and are manufactured from detailed engineering drawings provided by the end users.

6. Paragraph three of the Agreement provided that it could be terminated "with a notice of six months, however, if Ferroperm takes the action of termination, Seacor Piezo Ceramics will continue exclusive sales to companies that have been served by Seacor Piezo Ceramics for three years after the notification of termination."

7. Under paragraph 1 of the Agreement, Seacor had an affirmative duty to notify customers of the option to purchase piezo ceramics directly from Ferroperm, FOB Copenhagen, and Seacor complied with that obligation prior to notice of termination.

8. Seacor set its own prices for customers who chose to purchase Ferroperm piezo ceramics through Seacor and received a 12.5% commission on sales made directly by Ferroperm (F.O.B. Copenhagen).

9. Although the Agreement, by its terms, was not exclusive, during the eight years it remained in effect, Ferroperm made no effort to develop its own United States customers or solicit Seacor's United States customers. Seacor did not sell piezo ceramics manufactured by any other company, and the two companies cooperated to provide service and technical support to Seacor's U.S. customers.

10. Seacor did not take ordinary steps to protect certain of its confidential information from disclosure to Ferroperm because the two companies had an understanding that Ferroperm would not use Seacor's proprietary commercial information to solicit Seacor customers.

11. Although throughout most of the years the Agreement was in effect Ferroperm's Managing Director, Wanda Wolny, worked closely and harmoniously with Seacor's principal, Eve Volk, Wolny became upset with Seacor when, during Seacor's negotiations to purchase Ferroperm, she was informed that she would not have the top executive position at Ferroperm after an acquisition of the company by Seacor.

12. In the Fall of 2000, while Seacor was in final negotiations with Ferroperm's owner to purchase the company, Wolny encouraged defendants American Piezo Ceramics, Inc. ("APC") and APC International, Ltd. ("APCI") to bid

3

for the purchase of Ferroperm, secretly providing these defendants with confidential financial information about Seacor's bid.

13. APCI purchased Ferrroperm on or about March 29, 2001, assuming all of Ferroperm's obligations under the Agreement with Seacor.

14. After considering the issue of whether Seacor should be retained as a Ferroperm distributor for some months prior to the Ferroperm closing, Ian Henderson, APCI's CEO, in consultation with Wolny and Ronald Staut (an officer of APC), decided to terminate Seacor. At the time the decision was made, Wolny and Henderson were aware that Seacor was selling Ferroperm parts to many of its customers at a substantial markup, and Defendants expected to be able to realize Seacor's markups for the benefit of APCI and/or Ferroperm.

15. Although Seacor had contacted Ferroperm and APCI to inquire about the status of Ferroperm after hearing rumors of an impending acquisition, Defendants did not notify Seacor of the acquisition until some days after the closing.

16. On April 20, 2001, APCI sent a letter to Seacor purporting to terminate the Agreement immediately, ignoring the six month's termination and three-year exclusive dealing provision. In its termination letter, APCI did not claim that the termination was for cause or that Seacor had, in any respect, breached the Agreement.

17. Some days prior to notifying Seacor of the planned termination, Defendants set up meetings with two of Seacor's largest customers without

4

informing Seacor. They obtained Seacor's proprietary open orders and pricing from these customers.

18. At about the same time the termination letter was sent, and before Seacor had actual notice of termination, Defendants also contacted most of Seacor's other customers, notified them of the termination and instructed them they could deal directly with Ferroperm.

19. In engaging in this conduct, Defendants deliberately concealed from Seacor their intentions to terminate Seacor and divert Seacor's customers while they made overtures to Seacor's customers.

20. After Defendants had contacted the Seacor customers, they refused to ship parts to fill Seacor's open orders, creating confusion in the marketplace when Seacor filled orders from its inventory and Ferroperm attempted to fill Seacor's orders directly. These actions caused deep confusion and concern among Seacor's customers about the source of critical piezo ceramics parts.

21. The disruption in the marketplace caused by Defendants led Seacor's largest customer, PCB to take steps to locate alternative suppliers for many of its piezo ceramics parts, and harmed Seacor's reputation with all of its customers as a reliable source of piezo ceramics.

22. On or about May 4, 2001, a temporary injunction order was entered in this case requiring Defendants to fill Seacor's orders and prohibiting them from interfering with Seacor customers.

23. About two months after a two day hearing held in July of 2001, a preliminary injunction order was entered in this case, requiring Defendants to fill Seacor's orders and provide technical support for such orders through the end of the three-year period established by paragraph 3 of the Agreement, and prohibiting Defendants from soliciting Seacor customers for sales of Ferroperm products that were the same as or similar to Ferroperm products sold by Seacor prior to the April 20, 2001 notice of termination.

24. During the period in which the Preliminary Injunction was in effect, on many occasions Defendants communicated with Seacor customers about commercial matters, which was prohibited by the injunction, in many instances failing to timely copy Seacor on the communications, or, in some instances, failing to copy Seacor at all.

25. In or about April of 2002, APCI sold its interest in Ferroperm (more specifically, its interest in the Danish company formed by APCI to own Ferroperm) to a group of investors that included Ferroperm's management employees.

26. In 2003 and the first few months of 2004, prior to the expiration of the Preliminary Injunction, Ferroperm knowingly sold products to PCB that were the same as or similar to products that had been sold by Seacor in violation of the Preliminary Injunction. Ferroperm sought to conceal these transactions from Seacor by deceptively invoicing the PCB parts to a PCB German distributor, SynoTECH, and sending two of the orders to Erwin Rakoczy, PCB's supply chain manager, at his home address in Clarence, New York (Mr. Rakoczy promptly

delivered the parts to PCB and they were used by PCB). Ferroperm also failed to copy Seacor on any of the correspondence or other paperwork concerning the sales of a PCB part purportedly made to SynoTECH but destined for PCB.

27. Seacor has sustained damages in the form of lost sales during the Preliminary Injunction period. In addition to the PCB sales deceptively made through SynoTECH, Seacor has tracked other lost PCB sales through projections prepared by PCB concerning its needs for eight piezo ceramics parts included in a bid package forwarded to Seacor and other piezo ceramics vendors in July of 2002 and a concomitant reduction in the volume of orders PCB placed with Seacor.

28. Seacor also has lost sales to other specific customers and its overall sales dropped off significantly during the Preliminary Injunction period as a result of Defendants' breaches of contract and wrongful conduct.

29. Seacor's reputation as a reliable vendor in the small sub-market of piezo ceramics has been severely damaged by Defendants' deliberate and wrongful acts.

## CONCLUSIONS OF LAW

### Breach of Contract (Covenant of Good Faith and Fair Dealing)

1. Defendants breached the Agreement, as supplemented by the course of dealing between Seacor and Ferroperm, by terminating Seacor without prior notice, refusing to ship products to Seacor to fill its orders and notifying Seacor customers they could fill orders directly with Ferroperm.

2. Notwithstanding the entry of temporary and preliminary injunctions in this action, Seacor sustained damages from Defendants' breaches of the Agreement that were not remedied by the injunctive orders. Defendants' breaches panicked Seacor's customers, spurring them to seek out alternate sources of supply, thereby harming Seacor's business reputation and reducing Seacor's sales over the course of the three year run-out period. Seacor also lost sales due to Ferroperm's sales to SynoTECH in an effort to evade the Preliminary Injunctive terms.

3. The measure of damages in a breach of contract action is to place the injured party, so far as possible, "in the same position that party would have occupied had the contract not been breached." *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1185 (2d Cir.) *cert. denied* 517 U.S. 1119 (1995); *L. F. Pace & Sons, Inc v. Travelers Indemnity Co.*, 9 Conn. App. 30, 41 *cert. denied* 201 Conn. 811 (1986).

4. Lost profits are recoverable for breach of contract, "unless they are too speculative and remote . . . whenever their loss arises directly from and as a natural consequence of the breach." *Ambrogio v. Beaver Road Associates*, 267 Conn. 148, 155 (2003) (Citations and quotations omitted).

5. Although compensatory damages need not be proved with mathematical exactitude, "the plaintiff must nevertheless provide sufficient evidence for the trier of fact to make a fair and reasonable estimate." *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp.*, 245 Conn.

1, 65 (1998). "Doubts as to exact amounts [of lost profits] generally are resolved against the party in breach." *Message Center Management, Inc. v. Shell Oil Products Co.,* 85 Conn. App. 401, 421 (2004).

    6.    Seacor's damages for breach of contract consist of the profits from lost sales to customers that ceased purchasing from Seacor due to Defendants' breach of the notice and run-out provisions of the contract, as well as lost sales due to Ferroperm's refusal to ship parts to fill orders placed prior to the expiration of the run-out period and its usurpation of orders that otherwise would have been placed by Seacor prior to the expiration of the run-out period.

**<u>Tortious Interference with Business Relations</u>**

    1.    An action for tortious interference with business expectancies requires proof of "1) a business relationship between plaintiff and another party, 2) the defendant's intentional interference with the business relationship while knowing of the relationship, and 3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). The interference must be carried out with "some improper motive or improper means." *Blake v. Levy*, 191 Conn. 257, 262 (1983). This element "may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously . . . [t]he plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will but intentional interference without justification." *Daley v. Aetna Life and Casualty Co.*, 249 Conn. 766, 805-06 (1999).

The "actual loss" element of tortious interference with business relations can be satisfied without being able to prove compensatory damages to a reasonable degree of certainty. *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. at 27-37.

2. Seacor had business relationships with the customers to which it was selling Ferroperm piezo ceramics, and Defendants intentionally interfered with these relationships by setting up undisclosed meetings with two customers to solicit sales even before notifying Seacor about the planned termination, misappropriating Seacor's proprietary orders and pricing, notifying Seacor customers that the customers could purchase directly from Ferroperm, communicating with Seacor customers about commercial matters during the Preliminary Injunction period, often without copying Seacor on the communications, and carrying out an elaborate ruse to sell PCB parts for which Seacor had exclusive sales rights in violation of the Preliminary Injunction.

3. Defendants acted with both improper means and motives, in the following ways: Wolny shared Seacor's confidential financial information with the other Defendants to assist them in defeating Seacor's bid for the company and to acquire Ferroperm, Defendants conspired to divert Seacor's customers by withholding information from Seacor about the planned termination while Defendants secretly contacted customers to divert orders, they misappropriated Seacor's confidential orders and pricing information, they ignored the three-year run-out provision of the Agreement and sought to divert all U.S. sales to Defendants by refusing to ship to Seacor upon notice of termination, they

continued to communicate covertly with Seacor customers on commercial matters in breach of injunctive orders, and finally, Ferrroperm participated in a ruse to sell parts to PCB in violation of the preliminary injunction.

4.  Seacor sustained an "actual loss" as a result of Defendant's tortious interference with its business relations in the form of lost sales and severe damage to its reputation as a stable provider of piezo ceramics.

5.  Damages caused by a tort require proof by evidence showing the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit. Restatement 2d of Torts, § 912; cf. S&K Sales Co. v. Nike, Inc., 816 F.2d 843, 851 (2d Cir. 1987) (citing Restatement (Second) Torts in upholding tort damages award based on lost profits under New York law). Where the damage sustained consists of harm to a business, "it is necessary to show at least that the right is valuable . . . [and] that the injured person prove that the enterprise was or was likely to be profitable and that the chance for profits has been interfered with." Restatement 2d Torts, § 912, comment d; also Cheryl Terry Enterprises, Ltd. v. Hartford, 270 Conn. 619, 639 (2004) (sufficient proof of antitrust damages where plaintiff business owner testified, based on her experience in business, about lost bid and profit company should have earned from bid); Carrano v. Yale-New Haven Hospital, 279 Conn. 622, 646 (2006) (testimony of one witness, uncorroborated by documentary evidence, could be adequate to prove damages). "The amount of lost profits may

be determined by approximation based on reasonable inferences and estimates." *Robert S. Weiss and Associates, Inc. v. Wiederlight*, 208 Conn. 525, 541 (1988)

6.  Seacor can prove compensatory damages in the form of lost profits sustained from April 20, 2001 through April 19, 2003, through testimony of its managing member about overall sales before and after Defendants' tortious conduct, and particular lost sales to certain customers, including specific information about lost orders for particular piezo ceramics parts. The evidence about lost sales to PCB is corroborated by testimony of Michael Seitz, PCB's former supply chain manager, who has attributed PCB's decision to seek out other sources of supply to Defendants' conduct, of another former supply chain manager for PCB, Erwin Rakoczy, who has testified about Ferroperm's simulated sales to SynoTECH, and another PCB employee, Camille Saia, who has testified about the secret pre-termination meetings, and is expected to testify about the simulated SynoTECH sales.

7.  Punitive damages are appropriate where defendants have acted with reckless indifference to a plaintiff's rights, or have intentionally or wantonly violated those rights, even absent any intention to do harm. *Martinelli v. Bridgeport Roman Catholic Diocese Corp.*, 10 F.Supp.2d 138, *aff'd in part, vacated in part*, 196 F.3d 409 (1998).

8.  Punitive damages are appropriate in this case because Defendants' have acted deceptively, in knowing derogation of Seacor's rights under the Agreement and the injunctive orders, for motives of personal animus and greed.

## Violation of the Connecticut Unfair Trade Practices Act (codified at Conn. Gen. Stat. § 42-110a *et seq.*)

1.  CUTPA is violated where, as here, defendants, in the course of a trade or business, have engaged in unfair or deceptive acts. Conn. Gen. Stat. 42-110(b).

2.  Acts are unfair or deceptive if it satisfies one or more of the following criteria: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statute, the common law, or otherwise – in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other business persons . . . " *Hartford Electric Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 367-68 (1999). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*

3.  A breach of contract that also involves deception on the part of a defendant may be actionable under CUTPA. *Hackett v. Bills Floor Sanding, Inc.*, 2002 WL 1459104 (Conn. Super. 2002).

4.  Whereas tortious interference with business relations almost always constitutes a CUTPA violation, a plaintiff can prevail on a CUTPA claim even if it has not prevailed on a tortious interference claim predicated on the same facts. *Fabri v. United Technology Intern., Inc.*, 193 F.Supp. 2d

480 (D. Conn. 2002); *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 507 (1995) (*quoting Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747).

  5. Defendants violated CUTPA by its intentional breaches of the notice and run-out provisions of the Agreement. Defendants' admitted the Agreement was not ambiguous and knew about these provisions, and yet they deceptively attempted to co-opt Seacor's customers by failing to notify Seacor of the termination decision until after Defendants had secretly solicited Seacor's customers and misappropriated proprietary information, and then refused to ship products to Seacor despite the unambiguous six months' notice provision and three year run out provision. Defendants not only concealed from Seacor all of their activities, but also misinformed Seacor's customers that the customers did not have to deal with Seacor any longer and Seacor would be unable to fill customer orders.

  6. Defendants further violated CUTPA by unfair and deceptive conduct consisting of its interference with Seacor's customer relations, including the secret meetings, misappropriation of confidential information and solicitations and sales in violation of the injunctive orders.

  7. Compensatory damages may be awarded for a violation of CUTPA where the conduct at issue constitutes an unfair or deceptive trade practice, and the plaintiff has provided the court with "a basis for a reasonable estimate of the damages suffered." *Whitaker v. Taylor*, 99 Conn. App. 719, 733 (2007).

8. It is not necessary to prove quantifiable damages in order to meet the CUTPA element of proving "ascertainable loss." *Service Road Corp. v. Quinn*, 241 Conn. 630, 637-45 (1997); *see also Bristol Technology, Inc. v. Microsoft Corp.*, 114 F.Supp.2d at 77, n. 29 (D. Conn. 2000); *Fabri v. United Technologies, Int'l., Inc.*, 193 F.Supp.2d at 482-83.

9. Plaintiff Incurred "ascertainable loss" as a result of Defendant's tortious interference with its business relations because Defendants' conduct not only led to the lost sales that comprise Seacor's compensatory damages claim, but the interference also fostered confusion in the marketplace, harming Seacor's reputation as a stable source of supply for crucial piezo ceramics parts.

10. A CUTPA plaintiff that is awarded injunctive relief may be awarded attorneys' fees absent any proof of compensatory damages. *Service Road Corp. v. Quinn*, 241 Conn. at 644; *also Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 623-27 (1981).

11. The Court also has the discretion to order punitive damages. *Whitaker v. Taylor*, 99 Conn. App. at 733.

12. Evidence that the defendant "has acted with reckless indifference to the rights of the plaintiff or has committed an intentional and wanton violation of those rights is a necessary prerequisite to the award of punitive damages . . . " *Id.*

13. Defendants acted willfully and with reckless indifference to Seacor's rights in secretly contacting its customers and misappropriating proprietary information prior to notifying Seacor of the wrongful termination, persisting in

soliciting customers and concocting a scheme to make sales to PCB in violation of Seacor's rights under the Preliminary Injunction Order.

_____
Marie A. Casper (ct#08974)

Zeldes, Needle & Cooper
A Professional Corporation
1000 Lafayette Boulevard
Bridgeport, CT  06604
Telephone:  (203) 333-9441
Facsimile:  (203) 333--1489
E-Mail: mcasper@znclaw.com

Attorneys for Plaintiff
Seacor Piezo Ceramics, LLC

16