# EXHIBIT  H

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SEACOR PIEZO CERAMICS, LLC,

                Plaintiff,

        v.

APC INTERNATIONAL, LTD.,
AMERICAN PIEZO CERAMICS, INC.,
and FERROPERM PIEZOCERAMICS A/S,

                Defendants.

**DEFENDANTS' PROPOSED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Case No.:  3:01CV00754 (AWT)

Defendants, APC International, Ltd. ("APCI"), American Piezo Ceramics, Inc. ("APC"), and Ferroperm Piezoceramics A/S ("Ferroperm") (collectively referred to as "the defendants"), pursuant to the standing order regarding trial memoranda in civil cases issued by the United States District Court for the District of Connecticut, proposes the following findings of fact and conclusions of law:

### PROPOSED FINDINGS OF FACT

1.     On or about February 4, 1992, plaintiff, Seacor Piezo Ceramics, LLC ("Seacor"), an Industrieselskbet Ferroperm A/S, Ferroperm's predecessor-in-interest, entered into an agreement, pursuant to which Seacor was to act as the "the agent and distributor" for Ferroperm in the United States on a "non-exclusive" basis ("the Agreement"). While the Agreement allowed Seacor to fix its own resale prices, Seacor was obligated to inform all customers about the alternative possibility of purchasing components F.O.B. Denmark.

{778650:}

2.    The products manufactured by Ferroperm are piezo ceramics, components whose properties allow mechanical energy to be transformed into electrical energy and electrical energy to be transformed into mechanical energy.

3.    Piezo ceramic components are used in a wide variety of testing and measurement equipment, including accelerometers, sensors, vibration analysis devices and similar prducts.

4.    Pursuant to the Agreement, in the event a Seacor/Ferroperm customer elected to purchase its piezo ceramic products F.O.B. Denmark, then Seacor was to be paid a commission of 12.5%.

5.    A commission of 12.5% is unusually high for a sales representative or agent.

6.    At all times relevant to this action, Seacor was a Connecticut limited liability company having its principal place of business in Branford, Connecticut.

7.    All times relevant to this action, APCI was a Delaware corporation having its principal place of business in Mackeyville, Pennsylvania.

8.    All times relevant to this action, APC was a wholly-owned subsidiary of APCI and a Pennsylvania corporation with its principal place of business in Mackeyville, Pennsylvania.

9.    Until March 29, 2001, Ferroperm was a Danish corporation with its principal place of business in Kvistgard, Denmark.

10.    On March 29, 2001, APCI acquired Ferroperm from its Danish owners.

11.    By facsimile dated April 3, 2001, Ron Staut, Vice President of Market Development, Technology & Technical Sales for APCI and Acting Managing Director of Ferroperm, notified Seacor's President, Eve Volk, that APCI's acquisition of Ferroperm had taken place.

12.    In connection with the acquisition, APCI's management began to evaluate the status of Ferroperm's distributors and agents and, to that end, conferred with Wanda Wolny, Ferroperm's longtime manager, concerning the status of those representatives.

13.    In connection with these evaluations, Ms. Wolny brought to the attention of Mr. Staut and Ian Henderson, APCI's President, that Seacor's payments were becoming chronically late and that customer complaints about Seacor's lack of responsiveness were increasing.

14.    By late 2000, timely payments by Seacor were the exception rather than the rule and, in one instance, Ms. Volk falsely blamed her bank for delay in payment which she had caused.

15.    Documentation supplied by Ms. Wolny to Mr. Henderson also demonstrated that Seacor's lack of responsiveness increased in the year prior to APCI's acquisition of Ferroperm.

16.    Ms. Volk has acknowledged that Seacor's payments to Ferroperm were not always timely and that she had falsely blamed her bank for one late payment. Ms. Volk has also acknowledged that she failed to follow up on inquiries from existing or prospective customers, some of whom had called Seacor repeatedly.

17.    Based upon the information which Ms. Wolny had supplied Mr. Henderson and his conclusion that Seacor had not appreciably expanded the customer base in years, Mr. Henderson decided to terminate Seacor as Ferroperm's distributor and agent. This decision was made after Mr. Henderson consulted with both Ferroperm's Board of Directors and outside counsel.

18.    In connection with the acquisition, Mr. Henderson sought the opinion of an attorney, Harry P. Messina, Jr., Esq., with respect to the Agreement and Ferroperm's options

regarding Seacor. Mr. Messina had opined that, if Seacor had breached the Agreement, for example, by failing to make payment or by failing to advise customers of their option to purchase F.O.B. Denmark, then Ferroperm could terminate the Agreement without any further obligation to Seacor. Absent such breach, it was Mr. Messina's opinion that Ferroperm could terminate Seacor, deal with the customers directly and pay Ferroperm a 12.5% commission on all orders to Seacor customers.

19.    Despite the fact that APCI management justifiably believed that Seacor had breached this Agreement and was entitled to no further benefits under its terms, Ferroperm elected to terminate Seacor in accordance with the Agreement's terms and propose to pay a 12.5% commission during the three year run-out period of the Agreement.

20.    By letter dated April 20, 2001, Mr. Henderson notified Seacor that it was terminating the Agreement effective that day. Mr. Henderson's letter advised Seacor that Ferroperm would pay a 12.5% commission on paid invoices over the three year run-out period so long as Seacor did not interfere or otherwise obstruct the relationship between the customers and Ferroperm.

21.    Prior to Seacor's termination, Mr. Staut personally called upon two customers, Kistler and PCB, both located in the Buffalo, New York area. The purpose of each meeting was to advise the customer's representatives of the acquisition and to inform these cusomters that they could purchase directly from Ferroperm or continue to purchase their piezo ceramic components from Seacor.

22.    Rejecting APCI's interpretation of the Agreement, Seacor commenced suit against the defendants in early May of 2001.

{778650:}                                                 4

23.     On May 4, 2001, a temporary restraining order was issued by the United States District Court for the District of Connecticut, enjoining and restraining the defendants from soliciting or selling to the parties' customers the same or similar products which had been sold by Seacor to such customers until further order of the Court.

24.     Upon issuance of the temporary restraining order, Ms. Volk notified the customers that they were to continue dealing with Seacor and would not be permitted to deal directly with Ferroperm.

25.     Because of the alacrity with which Seacor had sought judicial relief and obtained a temporary restraining order, none of the customers who had been purchasing their piezo ceramics from Seacor had orders filled by Ferroperm.  From the date of the issuance of a temporary restraining order through the end of the three year run-out period, none of the customers who had been purchasing their piezo ceramics from Seacor as of April 20, 2001, purchased piezo ceramics directly from Ferroperm.

26.     Following a hearing in July of 2001 and on September 11, 2001, the temporary restraining order was transformed into a preliminary injunction which, in all material respects, continued the restraint contained in the temporary restraining order.

27.     In April of 2002, Ferroperm was sold by APCI in a management buy out ("MBO").  Thereafter, APCI and APC were not involved in any of the transactions or communications with the Ferroperm/Seacor customers.  As part of the MBO, Ferroperm agreed to honor the terms of the preliminary injunction.

28.     In all material respects, the defendants complied with the terms of temporary restraining order and the preliminary injunction.

29.    In July of 2002, Seacor was notified that PCB was soliciting bids from a variety of vendors for eight of its most commonly used piezo ceramic parts.

30.    PCB's decision to solicit vendors for its piezo ceramics requirements was, in no way, motivated by any uncertainty PCB may have had regarding the company's relationship with Seacor and/or Ferroperm.  Rather, the initiation of a competitive bidding process was part of a company-wide business practice implemented within PCB.

31.    Any diminution in "overall lost business" sustained by Seacor in late 2001, 2002 and 2003 cannot be attributed to any acts or omissions on the part of the defendants.

32.    There was a downturn in the demand for electronics components, in general, and piezo ceramics, in particular, during this period of time, particularly in 2002.  Sales by Ferroperm to customers other than Seacor and APC's sales also declined during this period.

33.    At no time following APCI's acquisition of Ferroperm did Connection Technologies Center ("CTC") purchase its piezo ceramics from a manufacturer other than Ferroperm.  Until the conclusion of the run-out period, all such components were purchased through Seacor.

34.    CTC did not purchase production parts from Morgan Electro Ceramics BV.

35.    Because CTC did not purchase piezo ceramics from an alternate supplier, Seacor suffered no lost revenues as a result of lost sales from CTC.

36.    Any increase in price imposed by Ferroperm for parts which Seacor ordered for CTC was attributable to a reduction in the volume of the orders and a corresponding increase in price.

37.    Quantity discounts between Seacor and Ferroperm were common.

38.    Seacor sustained no damages attributable to a loss or diminution in business with Misonix as a result of any acts or omissions on the part of the defendants.

39.    Toward the end of the run-out period, Seacor purchased approximately Twelve Thousand Two Hundred Dollars ($12,200.00) worth of piezo ceramic components from Ferroperm in the expectation that these products could be sold to Misonix. At the time, Seacor did not have a purchase order from Misonix.

40.    Ordinarily, Seacor would purchase piezo ceramic components from Ferroperm only after receiving a purchase order from the customer.

41.    In some cases, Seacor purchased piezo ceramic components from Ferroperm for inventory and, toward the end of the run-out period, increased the size of its orders beyond the customary levels.

42.    Seacor claims it sustained damages in the amount of Eight Thousand Six Hundred Seventy Dollars ($8,670.00) as a result of parts Seacor ordered from Ferroperm intended for Kistler which were not shipped.

43.    Any failure or refusal on the part of Ferroperm to ship piezo ceramic components to Seacor which were ultimately destined for Kistler were properly withheld because of payment problems on the part of Seacor.

44.    Seacor claims damages in the amount of Six Thousand Two Hundred Seventy-two Dollars ($6,272.00) for piezo ceramic parts ordered from Ferroperm intended for Unholtz Dickey.

45.    Any failure or refusal on the part of Ferroperm to ship parts to Seacor for Unholtz Dickey was attributable to payment problems on the part of Seacor.

46.    Ferroperm did not receive any direct orders from Misonix until January of 2005.

47.  Ferroperm did not receive any direct orders from Piezo Kinetics until November of 2004.

48.  Ferroperm did not receive any direct orders from Unholtz Dickey until March 15, 2005.

49.  Following APCI's acquisition of Ferroperm, and until the end of the run-out period, no Seacor order to Ferroperm was displaced or canceled, other than by agreement between Seacor and Ferroperm.

50.  Seacor lost no sales as a result of any of the actions on the part of the defendants between the date of the acquisition of Ferroperm by APCI and the issuance of the temporary restraining order.

51.  Seacor lost no sales as a result of any of the actions on the part of the defendants between the date of the issuance of the temporary restraining order and the entry of the preliminary injunction order.

52.  In November of 2003, Ferroperm received an order from a German company, Synotech, which supplied its own drawings and specifications and did not identify its ultimate customer.

53.  When Ferroperm representatives finally learned that Synotech was selling the piezo ceramics to PCB, less than a month remained on the run-out period and, by then, Ferroperm already had existing inventory and work in progress.

54.  Following the disclosure to Ferroperm that the Synotech orders were destined for PCB, no further orders were accepted from Synotech for this part.

55.  At all times, Ferroperm undertook to comply in good faith with the terms of the preliminary injunction order.

56.     The preliminary injunction remained in force through the balance of the run-out period which remained in effect until April 19, 2004.

57.     As a result of the preliminary injunction remaining in place through April 19, 2004, Seacor, in effect, received all of the equitable relief it requested in its complaint.

58.     Seacor owes Ferroperm approximately Twenty-eight Thousand Dollars ($28,000.00) in unpaid invoices.

## CONCLUSIONS OF LAW

59.     The defendants did not breach the Agreement.

60.     APCI terminated Seacor in accordance with the Agreement.

61.     The defendants' actions in terminating Seacor were based upon a good faith interpretation of the Agreement.

62.     Any actions undertaken by the defendants in March and April of 2001 which Seacor finds objectionable were consistent with defendants' good faith interpretation of the Agreement and minimal in scope.

63.     Any breach of the Agreement by the defendants was preceded by a material breach by Seacor.

64.     None of the aggravating factors necessary to support a claim under the Connecticut Unfair Trade Practices Act ("CUTPA") have been established.

65.     The defendants did not interfere with the Seacors relations with its customers. The two personal visits paid by Mr. Staut to PCB and Kistler were entirely appropriate and took place before Seacor was entitled to any exclusivity with respect to these customers. The defendants did not exploit confidential information to solicit the customers, who were customers of both Seacor and Ferroperm.

66.    Seacor sustained no ascertainable loss as a result of any acts or omissions on the part of the defendants as required by CUTPA.

67.    Seacor obtained complete relief consistent with the prayers for relief in its complaint in that the preliminary injunctive relief was transformed into a permanent injunction continuing through the balance of the run-out period.

68.    There is no basis for the award of punitive damages to Seacor.

69.    There is no basis for the award of attorneys' fees to Seacor.

70.    Ferroperm is entitled to damages in the approximate amount of Twenty-eight Thousand Dollars ($28,000.00) due to Seacor's failure to pay Ferroperm in full for goods it purchased.

DATED:    March 29, 2007
           Rochester, New York

Respectfully submitted,

WOODS OVIATT GILMAN LLP

By: _____
Donald W. O'Brien, Jr., Esq.
Federal Bar No. ct 22628
700 Crossroads Building
2 State Street
Rochester, New York 14614
585.987.2800
dobrien@woodsoviatt.com

and

REGNIER, TAYLOR, CURRAN & EDDY
Frederick M. O'Brien, Esq.
Federal Bar No. ct 08989
185 Asylum Street
CityPlace
Hartford, Connecticut 06103
860.249.9121
fobrien@rtcelaw.com

*Attorneys for Defendants*

{778650:}                                          10